## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LEONA BIAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:15-cv-00768-SGC |
| | ) | |
| CENLAR AGENCY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION[1]

The court has before it the February 1, 2018 motion for summary judgment

filed by Defendants Cenlar Agency, Inc. and Cenlar FSB (collectively "Cenlar").

(Doc. 49).  Pursuant to the court's initial order and February 28, 2018 order, the

motion is fully briefed and under submission as of March 30, 2018.  (Docs. 8, 49-

51, 53-55).  The motion is due to be granted for the following reasons.

## I.    STATEMENT OF FACTS

In October 2005, Cenlar began servicing a mortgage loan originally

executed by Plaintiff Leona Bias in October 1998.  (Doc. 50-1 at 2, 4).  In

connection with the loan, Bias executed a promissory note in the amount of

$114,000.00 in favor of New South Federal Savings Bank.  (*Id.* at 3, 10-12).  The

note was secured by a mortgage on certain real property located in Jefferson

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge
pursuant to 28 U.S.C. § 636(c).  (Doc. 7).

County, Alabama, at 5424 Wesley Drive, Birmingham, Alabama, 35228. (*Id*. at 3, 14-20). The mortgage loan is currently owned by Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the loan documents, consisting of the note and mortgage, are held by Bank of New York Mellon. (*Id*. at 3). In December 2009, New South Federal Savings Bank was closed by the Office of Theft Supervision, and the Federal Deposit Insurance Corporation ("FDIC") was named receiver of the bank's assets. (*Id*. at 4). On August 5, 2013, the FDIC assigned the Bias mortgage to Cenlar FSB. (*Id*. at 4, 33).

Bias began having trouble making her monthly mortgage payments around May 2014. (*Id*. at 4). Bias admitted she is not current as to the loan because she ran into financial trouble after she stopped working in December 2012. (Doc. 50-2 at 11). She testified she does not recall making a mortgage payment since June 2014. (*Id*. at 10-11).

On May 8, 2014, Cenlar sent Bias a letter stating her mortgage payment was thirty-seven days late and her loan was in default. (*Id*. at 35). The letter discussed options for Bias to consider regarding the default and attached information on how to receive help. (*Id*. at 35-52). On May 22, 2014, Bias called Cenlar and spoke to a Cenlar representative as to her payment issues. (Doc. 50-1 at 4). As part of the call, Bias authorized a partial payment of $516.24. (*Id*. at 4, 54; Doc. 50-3 at 17, 27). Bias explained she could not afford to make a full payment at the time but

she would call back in June and make another $500.00 payment to complete the full monthly payment. (Doc. 50-2 at 11; Doc. 50-3 at 27, 29). Bias testified she did not receive anything in writing accepting the partial payment. (Doc. 50-2 at 31).

The day after the call, on May 23, 2014, the $516.24 partial payment was reversed and placed in suspense because it was insufficient to constitute a full payment. (Doc. 50-1 at 5). On June 6, 2014, Cenlar returned the $516.24 partial payment to Bias via check. (*Id*.; Doc. 50-2 at 11-12). Bias did not make the $500.00 follow-up payment as discussed on the telephone call. (Doc. 50-3 at 17, 29-30).

On July 23, 2014, Cenlar sent Bias a notice of default letter to the property address. (Doc. 50-1 at 8, 57-58). The letter detailed a cure amount of $1,920.13 as to the default. (*Id*.). Bias did not timely satisfy the cure amount. (*Id*. at 8; Doc. 50-2 at 19-20). Then, on September 15, 2014, Cenlar sent Bias a letter offering her the opportunity to enter into a trial period plan to potentially modify the loan and cure her default. (Doc. 50-1 at 5, 60-66). Three days later, on September 18, 2014, Cenlar sent Bias another letter discussing payment default and other options for Bias to consider. (Doc. 50-1 at 5, 68-85). There is no evidence Bias did anything in response to the letters.

On October 22, 2014, counsel for Cenlar sent Bias two letters. (*Id*. at 5, 87-91). The first letter, entitled "Notice of Acceleration of Promissory Note and Mortgage," informed Bias the mortgage was in default, the amount due and payable as of that date was $85,155.95, and Cenlar was "commencing foreclosure under the terms of the [m]ortgage." (Doc. 50-1 at 87-89). Enclosed with the letter was a copy of the foreclosure notice noting the sale was scheduled for November 24, 2014. (*Id*.). The second letter also noted the foreclosure, discussed ways to avoid it, and included contact information for Bias to discuss possible alternatives. (*Id*. at 91). Notice of the November 24, 2014 foreclosure sale as to the property was published in the *Alabama Messenger* on October 25, November 1, and November 8, 2014. (Doc. 50-1 at 96).

On October 28, 2014, Cenlar sent a letter to State Farm Fire & Casualty, Bias' homeowner's insurance provider, notifying State Farm "a foreclosure action ha[d] commenced on behalf of the insured mortgagee against the above referenced property." (*Id*. at 5, 93-94). In response, State Farm contacted Bias by phone and told her that her homeowner's insurance would be cancelled. (Doc. 50-2 at 33). Bias told State Farm her insurance should not be cancelled because she was still living in the property. (*Id*.). State Farm confirmed the insurance coverage would not be cancelled. (*Id*.). Bias did not know if there was ever a lapse in coverage

and stated she did not suffer any damage to the property and never submitted an insurance claim during this period of time. (*Id*.).

On November 21, 2014, counsel for Bias sent Cenlar's lawyer a letter stating Bias denied Cenlar was the holder or owner of the mortgage or note, disputed the amount of debt, and requested the foreclosure sale be stopped. (*Id*. at 6, 98). That same day, counsel for Bias sent Cenlar a qualified written request ("QWR") under section 6(e) of the Real Estate Settlement Procedures Act ("RESPA"). (*Id*. at 6, 100). In response to the letters, Cenlar postponed the foreclosure sale, sent a letter to Bias acknowledging receipt of her recent correspondence, and sent a letter to counsel for Bias identifying Freddie Mac as the owner of the loan. (*Id*. at 6, 103, 105).

On January 12, 2015, Cenlar sent counsel for Bias a QWR response letter. (*Id*. at 6, 107-08). Among other documents included with the QWR response, Cenlar enclosed a payoff quote, as well as a reinstatement quote, which were good through January 30, 2015. (*Id*. at 110-14). Bias did not submit sufficient funds to reinstate or pay off the loan. (*Id*. at 7; Doc. 50-2 at 24).

On February 19, 2015, Cenlar sent a letter to Bias, in care of her attorney, re-noticing the foreclosure sale for March 18, 2015. (Doc. 50-1 at 7, 118-19). Notice of the mortgage foreclosure sale was published in the *Alabama Messenger* on February 21 and 28, and March 7, 2015. (*Id*. at 121). The foreclosure sale was

cancelled in response to the filing of this action against Cenlar. (*Id*. at 8). Cenlar has not foreclosed the mortgage. (Doc. 50-3 at 22).

Additionally, Bias testified that before she filed her complaint, she pulled her credit report and recalled a reference related to Cenlar stating "foreclosure." (Doc. 50-2 at 29). Bias did not contact the national credit reporting bureaus to dispute the foreclosure reference on her credit report. (*Id*.). She testified, however, she was denied a credit card in late 2014, but could not recall which company issued the denial. (*Id*. at 29-30). Bias did not produce the credit report or any documentation regarding the denial of a credit card despite being asked by Cenlar for documents supporting her claim.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving

party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## III.  DISCUSSION

Plaintiff's complaint asserts fourteen claims against Defendants. (Doc. 1-1 at 3-20). In her brief in opposition to summary judgment, Plaintiff concedes Defendants are entitled to summary judgment on her claims for slander of title (Count Five) and fraud (Count Seven). (Doc. 54 n.2-n.3). The following twelve claims remain: negligence (Count One); wantonness (Count Two); unjust enrichment (Count Three); wrongful foreclosure (Count Four); breach of contract (Count Six); false light (Count Eight); defamation, libel and slander (Count Nine); violations of the Truth in Lending Act ("TILA") (Count Ten); violations of the

RESPA (Count Eleven); violations of the Fair Credit Reporting Act ("FCRA") (Count Twelve); violations of the Fair Debt Collection Practice Act ("FDCPA") (Count Thirteen); and a claim for declaratory relief (Count Fourteen). The majority of these claims are brought pursuant to Alabama law. For the following reasons, Defendants are entitled to summary judgment as to each claim.

**A. Plaintiff's negligence and wantonness claims are not cognizable under Alabama law.**

In Counts One and Two of the complaint, Bias alleges Cenlar engaged in negligent and wanton conduct regarding the servicing of her loan, attempted to collect funds not owed, caused her property insurance to be cancelled, negligently defaulted Bias, and attempted to complete a foreclosure sale. (Doc. 1-1 at 6-8). Additionally, Bias claims Cenlar negligently and wantonly failed to prevent the dissemination of inaccurate and libelous information to others, including the credit bureaus and the general public. (*Id*.). Finally, Bias contends Cenlar negligently and wantonly trained and supervised the employees responsible for her mortgage account. (*Id*.). Cenlar contends these claims fail as a matter of law because Alabama law does not recognize a cause of action for negligent or wanton servicing of a mortgage account. (Doc. 49 at 13).

"To establish negligence, [a] plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994) (quoting

*Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992)).  "To establish wantonness, [a] plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty.  To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains."  *Id*.  "To establish a claim for negligent, reckless or wanton supervision, a plaintiff must show that '(1) the employee committed a tort recognized under Alabama law, (2) the employer had actual notice of this conduct or would have gained such notice if it exercised due and proper diligence, and (3) the employer failed to respond to this notice accurately.'"  *Shuler v. Ingram & Assocs*., 710 F. Supp. 2d 1213, 1227-28 (N.D. Ala. 2010) (quoting *Edwards v. Hyundai Motor Mfg. Ala*., LLC, 603 F. Supp. 2d 1336, 1357 (M.D. Ala. 2009)).

Counts one and two fail as a matter of law because "Alabama law does not recognize a tort-like cause of action for the breach of a duty created by contract." *Blake v. Bank of America, N.A.,* 845 F. Supp. 2d 1206, 1210-11 (M.D. Ala. 2012) (citations omitted).  Any obligation Cenlar owed to Bias arose from the legal relationship created by the loan documents.  These obligations do not give rise to a duty of reasonable care generally owed to members of the public.  *James v. Nationstar Mortg., LLC*, 92 F. Supp. 3d 1190, 1200 (S.D. Ala. 2015).  Because the duty Bias contends Cenlar breached are based on contractual agreements, her

negligence and wantonness claims are not legally cognizable under Alabama law. *U.S. Bank Nat'l Ass'n v. Shepherd*, 202 So. 3d 302, 314-15 (Ala. 2015) (holding that wantonness claims for servicing and handling mortgages are improper because the underlying duties are established by contract).

The same is true of Plaintiff's negligent training and supervision allegations. Those claims are entirely based on the employee's alleged negligent servicing, handling, and investigation of the mortgage account. As such, they fail as a matter of law because the only Alabama tort claims underlying those causes of action are the non-cognizable negligent and wanton servicing claims. *See Costine v. BAC Home Loans*, 946 F. Supp. 2d 1224, 1235 (N.D. Ala. 2013) (dismissing similar negligent hiring and training claims). Cenlar's motion for summary judgment on Plaintiff's negligence and wantonness claims is due to be granted.

**B.  Plaintiff's unjust enrichment claim is not viable because of the contract between the parties.**

Count Three of the complaint alleges Cenlar was unjustly enriched by the payment of fees, insurance proceeds, and equity in Bias' home in connection with the foreclosure attempts. (Doc. 1-1 at 8). Cenlar argues the unjust enrichment claim fails because a valid contract existed between the parties. (Doc. 49 at 15).

"The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So.

3d 1185, 1193 (Ala. 2008) (emphasis and internal quotation marks omitted). However, "the existence of an express contract extinguished an unjust enrichment claim altogether because unjust enrichment is an equitable remedy which issues only where there is no adequate remedy at law." *Univalor Trust, SA v. Columbia Petroleum, LLC*, 315 F.R.D. 374, 382 (S.D. Ala. 2016). Because of the existence of a contract here, Cenlar is entitled to summary judgment on Bias' claim of unjust enrichment.

### C. The wrongful foreclosure claim fails because there was no foreclosure.

In Count Four, Bias alleges Cenlar wrongfully initiated foreclosure proceedings and wrongfully attempted to conduct a foreclosure sale. (Doc. 1-1 at 8-9). In response, Cenlar maintains the wrongful foreclosure claim fails as a matter of law because no foreclosure sale occurred. (Doc. 49 at 16).

Under Alabama law, a "mortgagor has a wrongful foreclosure action whenever a mortgagee uses the power of sale given under a mortgage for a purpose other than to secure the debt owed by the mortgagor." *Reeves Cedarhurst Dev. Corp. v. First Am. Fed. Sav. and Loan*, 607 So. 2d 180, 182 (Ala. 1992). There is "no Alabama authority . . . under which the mere scheduling of a foreclosure sale, without more, has been found to constitute a mortgagee's exercise of the power of sale." *Hardy v. Jim Walter Homes, Inc*., 2007 WL 174391, at *6 (S.D. Ala. 2007). "[tT]he power of sale is exercised by selling, not merely by running a newspaper

advertisement preparatory to selling." *Id*. Because there has not been a foreclosure sale, Cenlar is entitled to summary judgment as to Plaintiff's wrongful foreclosure claim.

### D. Plaintiff's claim for breach of contract fails as a matter of law.

In Count Six of her complaint, Bias alleges Cenlar "breached the agreement by failing to comply with essential terms in paragraph 2 regarding the application of payment and the notice requirements of paragraph 22 of the agreement." (Doc. 1-1 at 9). Bias also alleges Cenlar failed to "apply regular monthly payments, supplemental monthly payments, in the proper manner . . ." and Cenlar failed to apply "some payments at all to Bias' account . . . ." (*Id*.). Cenlar argues Bias' claim fails because Bias did not perform under the contract, it applied all payments to her account, the mortgage cannot be modified by an oral statement, and Cenlar sent all required notices. (Doc. 49 at 18-22).

"The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Shaffer v. Regions Fin. Corp*., 29 So. 3d 872, 880 (Ala. 2009) (internal quotations and citations omitted). Bias' argument focuses on the alleged nonperformance of Cenlar. Without any citation to the record, she argues Cenlar failed to properly apply payments, refused to accept payments, failed to provide all required notices,

and failed to act in good faith and to deal fairly with Bias. (Doc. 54 at 26-29). Bias' contention misses a critical element of her claim for breach of contract, her own performance. It is undisputed, and Bias admitted multiple times in her deposition, she was in default for failing to make payments. As such, she cannot maintain a claim for breach of contract against Cenlar.

Even if she fully performed under the agreement, her allegations as to Cenlar's nonperformance fail. As to Bias' claim Cenlar improperly or failed to apply payments, the evidence does not support her blanket allegations. Other than the returned partial payment in June 2014, Bias did not identify any payments Cenlar allegedly misapplied, improperly returned, or cashed but failed to apply. Even if a Cenlar representative told Bias she could send a partial payment and the payment would be accepted, Cenlar's rejection of the partial payment would not constitute a breach of contract because the terms of the mortgage can only be modified in writing under Alabama's Statute of Frauds. *See* Ala. Code § 8-9-2(7).

Additionally, there is no evidence to support Bias' claim regarding Cenlar's alleged failure to send notices. Among other correspondence discussing Bias' default, a notice of default was mailed to Bias at the property address on July 23 2014; a notice of default and acceleration was mailed to her on October 22, 2014 along with a copy of the mortgage foreclosure sale notice related to the November 24, 2014 sale; and a foreclosure notice letter was sent in February 2015 as to the

March 18, 2015 foreclosure sale. (Doc. 50-1 at 5, 7, 57-58, 87-89, 118-19). Bias presented no evidence to dispute these notices were sent and delivered to the property. For these reasons, Bias' breach of contract claim fails, and Cenlar is entitled to summary judgment as to this claim.

### E. Plaintiff's false light, defamation, slander, and libel claims fail as a matter of law.

In Counts Eight and Nine of the complaint, Bias alleges Cenlar wrongfully publicized and communicated statements regarding her mortgage default to the community and to credit reporting agencies. (Doc. 1-1 at 11-14). She contends the alleged communications harmed her reputation, credit, and character. (*Id.*). Cenlar argues these claims fail because Cenlar did not publicize any false statements regarding Bias' loan. (Doc. 49 at 24-25).

Both claims require proof of a false statement. To establish a claim for false light, a plaintiff must show the defendant (1) "gave publicity to a matter" concerning the plaintiff, (2) placed the plaintiff in a "false light" that would be highly offensive to a reasonable person, and (3) did so with knowledge the publicized matter was false or with reckless disregard to its truth or falsity. *Regions Bank v. Plott*, 897 So. 2d 239, 244 (Ala. 2004) (quoting *Butler v. Town of Argo*, 871 So. 2d 1, 12 (Ala. 2003)). Additionally, a false-light defendant must communicate the matter at issue to the public at large "or to so many persons that the matter must be regarded as substantially certain to become one of public

knowledge." *Id*. at 245 (emphases omitted) (quoting *Ex parte Birmingham News, Inc.*, 778 So. 2d 814, 818 (Ala. 2000)).

Defamation also requires proof of a false statement. There are two types of defamation: libel, which involves the use of print media to publish a defamatory comment; and slander, which involves the oral expression of a defamatory comment. *Blevins v. W.F. Barnes Corp*., 768 So. 2d 386, 390 (Ala. Civ. App. 1999). Because Plaintiff's claim is based on written communications, the foreclosure sale notices, her claim is in reality one for libel, not slander. To prove a communication was defamatory, a plaintiff must present evidence establishing the following elements: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication of that statement to a third party; (3) fault amounting to at least negligence on the part of the defendant; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement." *McCaig v. Talladega Pub. Co., Inc*., 544 So. 2d 875, 877 (Ala. 1989) (citation omitted).

Bias argues the false statements relate to the publication of the foreclosure sale notices, the notification to credit reporting agencies, and the notification to Bias' homeowner's insurance carrier. Specifically, and without citation to anything in the record, Bias states "[i]t is clear from the complaint that the Plaintiff[] allege[s] that [she was] not in default in making [her] mortgage

payments and that Defendant published a notice in the newspaper which claimed that the Plaintiff[] [was] in default . . . ." (Doc. 54 at 24).

The evidence does not support Bias' allegations. Instead, the evidence establishes Bias defaulted on her obligations under the loan documents, including as to payments. Bias admitted she missed her payments. Any statements regarding the default, or that the loan was sent to foreclosure, were accurate and not false. Moreover, nothing in the two mortgage foreclosure notices was false.[2] Accordingly, Cenlar is entitled to summary judgment on Bias' claims for false light and defamation, slander, and libel.

### F. Plaintiff's TILA claim fails as a matter of law.

In Count Ten of the complaint, Bias alleges Cenlar violated TILA by making inadequate disclosures, charging unauthorized fees, and improperly calculating the annual percentage rate. (Doc. 1-1 at 14-16). Cenlar contends this claim fails as a matter of law because Cenlar was not Plaintiff's "creditors" with regard to the mortgage loan on the property. (Doc. 49 at 26). Cenlar also argues the TILA claims are time barred. (*Id*. at 26-27).

TILA provides a private right of action against "any creditor" who violates the requirements of the statute's credit transactions section and allows for actual

---

[2] To the extent these claims are based on credit reporting, they are preempted by the FCRA. *Gregory v. Select Portfolio Servicing, Inc.,* 2016 WL 4540891, at *8 (N.D. Ala. Aug. 31, 2016).

damages as a result of the failure and, with certain limitations, statutory damages.

15 U.S.C. § 1640(a). A "creditor" is defined as:

> a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence. . . .

15 U.S.C. § 1602(g). The civil liability provision of TILA does not apply generally to every person the statute regulates but only to originating creditors. *Gregory,* 2016 WL 4540891, at *14 (N.D. Ala. Aug. 31, 2016). Cenlar is not a "creditor" within the meaning of TILA because it is not the party to whom the loan was initially payable.

Additionally, "assignees can only be held liable for violations occurring in the original disclosure documents because any subsequent disclosure violation 'is not a violation apparent on the face of the disclosure statement provided in connection with such transaction pursuant to this subchapter.'" *Id.* Any TILA claims against Cenlar as an assignee of the loan based on origination disclosures occurred in October 1998. Therefore, they are time barred by TILA's one-year statute of limitations. *Id.* at *15. For these reasons, Cenlar is entitled to summary judgment as to Bias' TILA claims.

### G.  Plaintiff's RESPA claim fails as a matter of law.

In Count Eleven of the complaint, Bias alleges Cenlar violated RESPA by failing to timely acknowledge or respond to the QWR.  (Doc. 1-1 at 16).  In response, Cenlar states it sent two letters, one to Bias and one to her counsel, acknowledging receipt of the QWR and on January 12, 2015, sent a detailed response to the QWR, including supporting documentation.  (Doc. 49 at 27).  While Cenlar seemingly admits the response was untimely, Cenlar maintains her claim fails because Bias cannot show she suffered any damages attributable to the purported violation.  (*Id*. at 27-28; Doc. 55 at 12-13).

The RESPA establishes the procedures a loan servicer must follow, and certain actions it must take, upon receiving a QWR from a borrower. 12 U.S.C. § 2605(e).  Section 2605(e) of the RESPA requires a loan servicer to send a written acknowledgement of the borrower's QWR within five days and a written response to the QWR within thirty days.[3]  12 U.S.C. § 2605 (e)(1)(A), (e)(2).  Failure to adequately respond to a QWR results in liability "to the borrower for each such failure in . . . an amount equal to the sum of any actual damages to the borrower as a result of the failure. . . ."  12 U.S.C. § 2605(f)(1)(A).  To succeed on a claim under § 2605(e), Plaintiff "must show: (1) that Defendant is a servicer; (2) that Defendant received a QWR from the borrower; (3) that the QWR related to the

---

[3] Both time periods exclude public holidays, Saturdays, and Sundays.  12 U.S.C. § 2605(e)(1)(A), (e)(2).

servicing of the loan; (4) that Defendant failed to respond adequately; and (5) that Plaintiff[ is] entitled to actual or statutory damages." *Buckentin v. SunTrust Mortg. Corp*., 928 F. Supp. 2d 1273, 1292 (N.D. Ala. 2013).

Bais' QWR is dated November 21, 2014,[4] but there is no evidence in the record regarding how the letter was transmitted to Cenlar, including no evidence of the date it was actually mailed or whether it was faxed or emailed. Cenlar was required to acknowledge the QWR within five days, excluding legal public holidays, Saturdays, and Sundays. 12 U.S.C. § 2605(e)(1)(A). Cenlar's acknowledgment was sent on December 2, 2014. (Doc. 50-1 at 6, 103). Therefore, excluding Thanksgiving and intervening weekends, Cenlar's response was sent six days after Plaintiff's QWR was written.

"In other contexts, federal regulations provide a presumption that mail is received within five days of mailing." *Buckentin*, 928 F. Supp. 2d at 1293 (citations omitted). Absent any proof to the contrary, the court gives Cenlar the presumption the QWR was received within five days of mailing. Therefore, assuming the QWR was mailed the day it was written, the court presumes Cenlar

---

[4] The complaint alleges Bias sent two QWRs on September 12, 2014, and November 5, 2014, via certified mail, which were "signed for by Defendants acknowledging receipt of the QWR." (Doc. 1-1 at 16). The evidence belies these assertions. First, the only QWR was dated November 21, 2104. (Doc. 50-1 at 100-01). Second, there is no evidence Bias mailed the QWR by certified mail or that Cenlar signed for the letter. In fact, Bias failed to respond to Cenlar's request for admission stating "[a]dmit that you do not have any documents which support the claim in paragraph 92 of your [c]omplaint that the alleged [QWR] was sent by certified mail and was signed for by Defendants." (Doc. 50-5 at 6). Her failure to respond results in automatic admission no such documents exist. *See* Fed. R. Civ. P. 36(a).

received it on November 26, 2014.[5]  Excluding the weekend and Thanksgiving day holiday following the presumed date of receipt, Cenlar had until December 4, 2014, to respond.  Because Cenlar responded on December 2, 2014, Bias has not shown Cenlar failed to acknowledge their QWR within the appropriate time frame.

Additionally, even if Cenlar's response was untimely, Bias failed to show she suffered any actual damages attributable to the alleged RESPA violation.  Bias' home was not foreclosed as a consequence of insufficient or untimely information by Cenlar.  Instead, the November 24, 2014 foreclosure sale was postponed after Bias sent her QWR, Cenlar provided all requested information in January 2015, and the rescheduled March 18, 2015 foreclosure sale never went forward.  (Doc. 50-1 at 6-8).  Bias did not take any action in response to receiving Cenlar's January 2015 response to the QWR.  There is certainly no evidence she made any attempts to reinstate or pay off the loan.

"Plaintiff[] arguably may recover for non-pecuniary damages, such as emotional distress and pain and suffering, under RESPA."  *McLean v. GMAC Mortg. Corp.*, 398 F. App'x. 467, 471 (11th Cir. 2010) (*citing Banai v. Sec'y U.S. Dep't of Hous. & Urban Dev. ex rel. Times,* 102 F.3d 1203, 1207 (11th Cir. 1997) (a case under the Fair Housing Act)).  Bias, however, has not presented any competent evidence demonstrating any of her alleged emotional distress injuries

---

[5] The letter was mailed from Birmingham, Alabama, to Ewing, New Jersey.  (Doc. 50-1 at 100).

were caused by the RESPA violation. Bias' own testimony suggests she did not even know the QWR letter was sent on her behalf. (Doc. 50-2 at 22-23). Therefore, Cenlar is entitled to summary judgment on Bias' RESPA claims because she failed to establish either Cenlar failed to respond adequately or in a timely manner to her QWR or that she suffered actual damages as a result of the alleged RESPA violation.[6]

**H. Plaintiff's FCRA claim fails as a matter of law.**

In Count Twelve of the complaint, Bias asserts a violation of the FCRA. (Doc. 1-1 at 16-18). She alleges Cenlar inaccurately reported to national credit reporting agencies she was delinquent and in default as to her loan. (*Id.*). Bias also states in her complaint she contacted national credit reporting agencies and disputed the inaccurate information. (*Id.*).

"The FCRA imposes two separate duties on furnishers. First, [15 U.S.C.] § 1681s-2(a) requires furnishers to submit accurate information to [credit reporting agencies]. Second, § 1681s-2(b) requires furnishers to investigate and respond promptly to notices of [consumer] disputes." *Green v. RBS Nat'l Bank*, 288 F. App'x 641, 642 (11th Cir. 2008). The FCRA provides a private right of action for violations of § 1681s-2(b) only when "the furnisher received notice of the

---

[6] To recover statutory damages, a servicer must engage in "a pattern or practice of non-compliance with RESPA." *McLean*, 398 F. App'x at 471. There is no such evidence in this case.

consumer's dispute from a consumer reporting agency." *Peart v. Shippie*, 345 F. App'x 384, 386 (11th Cir. 2009).

Despite Bias' argument to the contrary, the undisputed evidence clearly shows Bias did not make a dispute to a credit reporting agency. Bias testified she did not contact the national credit reporting bureaus to submit a dispute. (Doc. 50-2 at 29). Additionally, Bias failed to respond to Cenlar's request for admission stating "[a]dmit that you do not have any documents which support the allegation of paragraph 94 of your [c]omplaint that 'Plaintiff disputed the account and false credit reporting.'" (Doc. 50-5 at 6). Her failure to respond results in automatic admission no such documents exist. *See* Fed. R. Civ. P. 36(a). Bias' conclusory statements in her brief fail to create a genuine issue of material fact. *See Anderson*, 447 U.S. at 248. Therefore, Cenlar is entitled to summary judgment on Bias' FCRA claims.

### I. Plaintiff's FDCPA claim fails because Cenlar is not a "debt collector" under the statute.

In Count Thirteen of the complaint, Bias asserts violations of the FDCPA. (Doc. 1-1 at 18-19). Bias alleges Cenlar sought unjustified amounts under the mortgage, threatened legal action, communicated with third parties regarding the nature of her debt, and falsely stated the amount of the debt owed. (*Id.*). Cenlar argues this claim fails because it is not a "debt collector" as defined by the FDCPA. (Doc. 49 at 29-31).

The FDCPA provides a civil cause of action against debt collectors who violate the provisions of the Act. *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011). To assert a claim under the FDCPA, a plaintiff must establish the following elements: "(1) the plaintiff has been the object of collection activity arising from consumer debt, (2) the defendant is a debt collector as defined by the FDCPA, and (3) the defendant has engaged in an act or omission prohibited by the FDCPA." *Janke v. Wells Fargo and Co.,* 805 F. Supp. 2d 1278, 1281 (M.D. Ala. 2011).

A debt collector is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). In general, the FDCPA "applies only to debt collectors and not to creditors or mortgage servicers." *Ingram v. Green & Cooper, Attorneys L.L.P.*, 2012 WL 1884598 *3 (N.D. Ga. 2012); *see also Madura v. Lakebridge Condo. Ass'n Inc.*, 382 F. App'x 862, 864 (11th Cir. 2010). "[C]onsumer's creditors, a mortgage servicing company, or an assignee of a debt are not considered debt collectors, as long as the debt was not in default at the time it was assigned." *Reese v. JPMorgan Chase & Co.*, 686 F. Supp. 2d 1291, 1307 (S.D. Fla. 2009) (internal quotations and citations omitted).

It is undisputed Cenlar first became involved with the servicing of Bias'
mortgage loan in 2005. There is no evidence Bias was in default in 2005. Instead,
Bias testified she made all her mortgage payments before June 2014. (Doc. 50-2 at
11). Accordingly, the mortgage loan was not in default when Cenlar began
servicing it, and Cenlar is not a "debt collector" under the FDCPA. Cenlar is
entitled to summary judgment on Bias' claims under the FDCPA.

### J. Plaintiff is not entitled to declaratory relief.

In the fourteenth and final count of the complaint, Bias seeks declaratory
relief based on the alleged wrongdoing of Cenlar. (Doc. 50-1 at 19). Because
Cenlar is entitled to judgment as a matter of law on all other counts of her
complaint, she cannot receive declaratory relief. *See Creative Compounds, LLC v.
Starmark Labs.*, 651 F.3d 1303, 1316 (Fed. Cir. 2011) ("Without an underlying
legal cause of action, any adverse economic interest that the declaratory plaintiff
may have against the declaratory defendant is not a legally cognizable interest
sufficient to confer declaratory judgment jurisdiction.").

## IV. CONCLUSION

For the foregoing reasons, Defendants Cenlar Agency, Inc. and Cenlar FSB
are entitled to judgment as a matter of law on all the claims asserted in Plaintiff's
complaint. As such, Defendants' motion for summary judgment is due to be

granted in full.  (Doc. 49).  A separate order will be entered.

**DONE** this 24th day of May, 2018.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE